UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| IN THE MATTER OF APPLICATION FOR A SEARCH WARRANT | Case No. 3:23mj___846___(RMS) |

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

I, Michael Rooney, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND BACKGROUND**

1.      I am a Detective with the Greenwich Connecticut Police Department in the Special Victims Section. I have been employed as a police officer in the state of Connecticut since 2003. As a police officer, I have participated in multiple investigations involving child exploitation and received training concerning the same.

2.      I am currently a deputized Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI") and have been so since 2022. As a TFO, I have been assigned to investigate violent crimes against children and have participated in multiple investigations involving child exploitation, trafficking of child pornography, and online enticement of minors. I received training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer crimes, and various other criminal law procedures. As a TFO, I am a federal law enforcement officer of the United States, and I am authorized to investigate violations of the laws of the United States and to request and execute warrants issued under the authority of the United States.

3.      I am currently investigating Stephen DICKSON ("DICKSON"), an adult male (YOB 1978) and resident of Colchester, Connecticut for violations of 18 U.S.C. § 2422(b)

(attempted enticement of a minor to engage in illegal sexual activity) and 18 U.S.C. § 2252A (certain activities relating to material constituting or containing child pornography) (collectively, the TARGET OFFENSES).

4.     I make this affidavit in support of an Application for a Search Warrant to search and seize multiple electronic devices, which are more specifically described in Attachment A (collectively, the "TARGET DEVICES"). The items are further described below:

    a.     One black Google Pixel cell phone that was seized from DICKSON's vehicle on September 22, 2023 ("TARGET PHONE").

    b.     On September 22, 2023, DICKSON provided consent for FBI to search electronic devices located at his residence in Colchester, Connecticut.[1] The following devices were obtained from DICKSON's residence on September 22, 2023, pursuant to his consent:

1. One WD My Passport (hard drive) S/N: WX21D176T66E

2. One Black Tower Computer With Clear Sides

3. One Toshiba Laptop S/N: 3G043577S

4. Synology D51522 (disk station) With 5 hard Drives

5. Synology DX517 (disk station) With 5 Hard Drives

6. Synology D51515 (disk station) With 4 hard Drives

7. One Drobo Black Hard Drive

8. One Silver Laptop With Gear Logo.

5.     Based upon the information summarized in this application, I have probable cause to believe that the TARGET DEVICES constitute and contain items that constitute

---

[1] The exact address of DICKSON's residence is known to me.

instrumentalities, fruits, and evidence of the TARGET OFFENSES and are specified in Attachment B.

6. The statements contained in this affidavit are based in part on information provided by other members of local, state, and federal law enforcement, and my own investigation, including personal observations, documents, and other investigative materials that I have reviewed, as well as my training and experience as a TFO with the FBI and police officer. Since this affidavit is being submitted for the limited purpose of obtaining a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the TARGET OFFENSES are located within the TARGET DEVICES, as more fully described in Attachment A.

## DEFINITIONS

7. The following definitions apply to this Affidavit and Attachment B:

a. "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

b. "Chat room," as used herein, refers to the ability of individuals to meet in one location on the Internet in order to communicate electronically in real-time to other individuals. Individuals may also have the ability to transmit electronic files to other individuals within the chat room.

c. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an

identifiable minor is engaged in sexually explicit conduct.

d. "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. Traditionally, IP addresses were either dynamic, meaning an Internet service provider ("ISP") assigns a different unique number to a computer every time it accesses the Internet, or static, meaning an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. Generally, the static IP addresses were assigned by those companies who offered "broadband" Internet service, such as through cable or digital subscriber line ("DSL"), whereas "dial up" companies would assign their users dynamic addresses. Now, however, as a greater number of American Internet users choose broadband Internet service, many of these users are being assigned what may be colloquially referred to as a "sticky dynamic IP address" or a "sticky IP." A sticky IP is a dynamically assigned IP address that does not change often. The address leases are usually set to long periods and simply renewed upon expiration.

e. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

f. "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

g. "Tor" is a computer network available to Internet users that is designed specifically to facilitate anonymous communication over the Internet. The Tor network is included in an area of the internet commonly referred to as the "dark web" because it is not publicly indexed on popular search engine websites (e.g., Google). The Tor network attempts anonymity by routing Tor user communications through a globally distributed network of relay computers, along a randomly assigned path known as a "circuit." Because of the way the Tor network routes communications through the relay computers, traditional IP address-based identification techniques are not effective.

## BACKGROUND ON Kik

8. Kik is a free smartphone messenger application that, according to its Law

Enforcement Guide (the "Guide"),[2] "lets users connect with their friends and the world around

them through chat." The Guide states that users can "send text, pictures, videos and more – all

within the app."[1] To use the Kik application, a user downloads the application to a mobile phone,

---

[2] Available at https://lawenforcement.kik.com/hc/en-us/articles/360039841472-Law-Enforcement-Guide (last accessed September 29, 2023)

computer, or other digital device via a service such as Apple's App Store or the Google Play Store. Id. Once the Kik application is downloaded and installed, the user creates an account and a unique username that cannot be changed. However, the user may change their display name. Once the user has created an account, the user is able to locate others via a search feature.

9. A Kik profile generally includes a profile picture, a username and a display name

     a. A profile picture may include a photograph or other depiction chosen by the user of the account.

     b. The display name is created by the user and may be the user's actual name (such as "Jane Doe") or other personal identifier. The display name is not unique (for example, there may be hundreds of people with the display name Jane Doe).

     c. The username is a unique identifier for the Kik user. It is not uncommon for the user name to be a combination of letters and numbers (for example, the username might be janedoe99).

     d. While a user may change his or her display name, the username for a Kik account stays constant for the duration of that account. In order to change a username, the user would have to create a different Kik account.

     e. According to "Kik's Guide for Law Enforcement," Kik users are also able to create chat groups with a limited number of individuals to communicate in a group setting and exchange text messages, images and videos. These groups are administered by the group creator, who has the authority to remove and ban other users from the created group. Once the group is created, Kik users have the option of sharing items, such as photos or videos, to the group as a whole or to any other user. These groups are frequently created with a group name containing a hashtag (#) that is easily identifiable or searchable by keyword. After a group is created, the original administrator can also designate other administrators for the group.

## USE OF COMPUTERS FOR CHILD PORNOGRAPHY

10. I have had both training and experience in the investigation of child exploitation offenses, including those involving child pornography. Based on my training, experience, and knowledge, I know that computers and digital technology, including cellular phones, are the primary way in which individuals interested in child pornography interact with each other.

Computers basically serve four functions in connection with child pornography: production, communication, distribution, and storage.

11. Through my experience and training, and that of other law enforcement officers, the following traits and characteristics are generally found to exist in cases involving individuals who collect images of child pornography, including digital images:

a. The majority of individuals who collect child pornography are individuals with a sexually-motivated attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depictions of children that are sexual in nature.

b. The majority of individuals who collect child pornography often seek out likeminded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance and support. This contact also helps these individuals to rationalize and validate their deviant sexual interest and associated behavior. The different Internet-based vehicles used by such individuals to communicate with each other include, but are not limited to, websites, mobile applications, email, email groups, bulletin boards, Internet chat programs, newsgroups, instant messaging, and other similar platforms.

c. Individuals who collect child pornography often collect and maintain points of contact to access and receive child pornography. In the digital context, individuals often maintain names and online user names, addresses (including email addresses, web addresses and URLs), of persons who have advertised or otherwise made known on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral or exchange, or a means to trade, access or receive child pornography. These contacts may be maintained in personal devices (computers and cellular telephones) as saved communications (e.g., message threads in an application or text messages), contacts, digital notes, bookmarks, word or text files, of in other digital formats.

d. The majority of individuals who collect child pornography rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect their collections from discovery, theft, and damage. I know from training and experience that such individuals have been known to maintain possession of their child pornography for years, or even decades. Collections are almost always maintained in the privacy and security of their homes or other secure locations, including personal devices, computers, cellular telephones, and external hard drives. As described herein, as computing power has increased and the price of memory and storage has decreased, it is quite easy for individuals to maintain gigabytes of data containing thousands of images of child pornography.

## PROBABLE CAUSE

## Background of the Investigation

12.     The FBI in Connecticut monitors certain online platforms including Kik for child exploitation investigations and, at times, uses an Online Covert Employee ("OCE")[3] for this purpose. In the instant investigation, the OCE was posing as a stepfather to a 14-year-old female from Connecticut on the Kik platform.

13.     On September 11, 2023, the OCE observed a Kik user with the display name "erpbridge" and user name "Brideg2-CT US (Fetlife same name)," in a Kik chat group.[4] On or about September, 11, 2023, the OCE initiated a chat with "Brideg2-CT US (Fetlife same name)"[5] (hereinafter, "Brideg2-CT") through personal message (that is, a private message from the OCE and not directed to a group of Kik users). Brideg2-CT and the OCE continued to communicate on Kik until September 22, 2023. Brideg2-CT US's profile listed that he had been a member of Kik since November 27, 2013.

14.     As detailed below, over the course of his communications with the OCE, Brideg2-CT stated that he wanted to engage in sexual intercourse with the 14-year-old female ("MINOR")[6] that the OCE told Brideg2-CT he had access to. During his communications with the OCE, Brideg2-CT stated he made a hotel room reservation for September 22, 2023, at the Fairfield by

---

[3] The OCE is certified and trained by the FBI to engage in online undercover investigations using a false persona.

[4] The name of the Kik chat group is omitted in this affidavit in order to protect other ongoing law enforcement investigations.

[5] Fetlife is a social network for fetish "kink" community. Based on review his Kik profile and the chat, it appears that he is indicating that Brideg2-CT has the same screenname on the Fetlife platform.

[6] MINOR is fictitious persona utilized by the OCE.

Marriott in Wallingford, Connecticut, and expressed that he reserved the room for the purpose of engaging in sexual intercourse with the MINOR. As detailed below, investigators were able to identify STEPHEN DICKSON, a 45-year-old Connecticut resident, as the user of the Kik account with the display name "Brideg2-CT." Brideg2-CT and the OCE exclusively used Kik to communicate.

15.     On September 22, 2023, DICKSON arrived at the Fairfield by Marriott and was arrested by officers of the Wallingford Police Department ("Wallingford PD") and charged with (1) Criminal Attempt at Illegal Sexual Contact Of a Victim Under The Age Of 16 Years Old; (2) Criminal Attempt at Sexual Assault 2nd, (3) and Criminal Attempt at Enticing a Minor. It is my understanding that DICKSON posted bond and was released from state custody on or about September 26, 2023.

## Identification of DICKSON

16.     On September 11, 2023, FBI issued an administrative subpoena on Kik requesting subscriber information for the account associated with username "erpbridge." The response from Kik identified that the registered email address for the account steve@erpbridge.com. The Kik response also identified that a Google cell phone using the Android operating system had been used to access the account. Notably, the TARGET PHONE is a Google cell phone that uses the Android operating system. The information provided by Kik also revealed that an IP address associated with Colchester, CT, where DICKSON resides, was repeatedly used to access the Kik account.

17.     An open source search for "erpbridge" resolved to a Twitter account with username '@erpbridge", display name "Stephen DICKSON" and location "Ct USA." The individual in the

"erpbridge" Twitter profile photo appears to be the same individual in the "erpbridge" Kik profile photo. An Accurint search for DICKSON in Connecticut resolved to Stephen DICKSON, YOB: 1978, residing in Colchester, Connecticut.

## Kik Communications

18.     As previously stated, "Brideg2-CT," who later was identified as by investigators as DICKSON, began communicating with the OCE on Kik on September 11, 2023, and these communications continued until September 22, 2023, the time of DICKSON's arrest. Below is an excerpt of the initial chat:

| DATE/TIME | FROM | TO | MESSAGE |
|---|---|---|---|
| 9/11/23 6:20 PM | OCE | Brideg2-CT | Hi |
| 9/11/23 7:50 PM | Brideg2-CT | OCE | Hi |
| 9/11/23 7:50 PM | OCE | Brideg2-CT | Hru…just was going rhrough the group ammnd notice PMs were open |
| 9/11/23 7:51 PM | Brideg2-CT | OCE | Yeah What group |
| 9/11/23 7:51PM | OCE | Brideg2-CT | The CT meetup |
| 9/11/23 7:52 PM | Brideg2-CT | OCE | Ah,ok. 45m, Hebron |
| 9/11/23 7:52 PM | OCE | Brideg2-CT | Is that ok? 46m New Haven |
| 9/11/23 7:53 PM | Brideg2-CT | OCE | Yeah, can talk |

| 9/11/23 7:53 PM | OCE | Brideg2-CT | Oh cool Im [name omitted] |
|---|---|---|---|
| 9/11/23 7:53 PM | Brideg2-CT | OCE | Who is [MINOR]? |
| 9/11/23 7:54 PM | OCE | Brideg2-CT | My step |
| 9/11/23 7:55 PM | Brideg2-CT | OCE | Gotcha. So what's you all's interests? |
| 9/11/23 7:55 PM | OCE | Brideg2-CT | We enjoy having discreet playtime together. |
| 9/11/23 7:55PM | Brideg2-CT | OCE | Just you two, or invite others? (I'm straight btw) |
| 9/11/23 7:56 PM | OCE | Brideg2-CT | She is actually my gfs daughter…just easier to call her my step. We have had others join. |
| 9/11/23 7:56 PM | Brideg2-CT | OCE | I might be interested…but want to know more. |
| 9/11/23 7:57 PM | OCE | Brideg2-CT | Really? Great |
| 9/11/23 7:57 PM | Brideg2-CT | OCE | Are you looking for someone bi or both of you, or ok with it straight for her? |
| 9/11/23 7:57 PM | OCE | Brideg2-CT | Id prefer straight |
| 9/11/23 7:58 PM | Brideg2-CT | OCE | Tell me about what your situation is…and of course about her |
| 9/11/23 7:58 PM | OCE | Brideg2-CT | Well first she is 14…is that too young? Its not for everyone. |
| 9/11/23 7:58 PM | Brideg2-CT | OCE | I'd be open to considering, if she looks cute |

19.     After these initial chats, Brideg2-CT and the OCE continued to exchange messages about MINOR and OCE's sexual activities. The OCE then asked Brideg2-CT what his current living situation was. He related, "I'm single, no kids." He continued, "I'll say it this way though…if I found a woman willing to share her daughter, or I had one of my own…I'd start fucking her at the first sign of tits or period, whichever came first. Moment she hits puberty…when her body is a woman."

20.     As the conversation continued, Brideg2-CT explained that he has a fantasy of "knocking up that preteen-teen daughter, but that's just fantasy." The OCE asked him if he was disease free. He informed the OCE that he was in fact disease free and that he would wear a condom, stating in part, "I'll wear condoms if you want[.] I am disease free, no drugs. Last partner was a couple years ago." The OCE replied to Brideg2-CT and told him, "Wow…I haven't found one of those in a bit…that's very good to know..safe too. That will make it more fun for all." Brideg2-CT replied, "Now if MINOR likes going to bed with a pussy full of warm cum right after a goodnight fuck, the bliss of her pussy cumming too… I'm not against that."

21.     Brideg2-CT asked the OCE to describe MINOR. The OCE replied stating, in part, "5'5… thin athletic [. . .] tight body.. enjoys gymnastics." Brideg2-CT's response to the OCE's description of MINOR is detailed in the excerpt below:[7]

---

[7] This excerpt of the chat between Brideg2-CT and the OCE, is a screenshot from the OCE's device was used to communicate with Brideg2-CT on KIK. The OCE's messages have a purple background and Brideg2-CT's have a black background.



22. Notably, investigators were able to identify that the profile photo assigned to Brideg2-CT, appears to match DICKSON's DMV photo. Additionally, Brideg2-CT identifies himself as "Steve." As previously stated, DICKSON's first name is STEPHEN.

23. As the conversation continued, the OCE asked Brideg2-CT "Have you ever been involved in an arrangement like this?" Brideg2-CT replied, "Not really. There's the swingers husband sharing his wife, boyfriend sharing his girlfriend, but that's only very distantly similar." Brideg2-CT elaborated, "I've talked to a few… but they end up ghosting or just being rp. So, never

proceeded much more than chat." Brideg2-CT explained that he was not into "rp." Based on my training an experience, I understand "rp" to be an abbreviation for role play. The OCE then advised him that he and MINOR are usually active during the evening hours on Tuesdays and Fridays, due to MINOR's mother working a second job during those times.

24.     The OCE asked Brideg2-CT about the experiences he has had as far as meeting people in person from Kik. Brideg2-CT explained that he previously met adult females on Kik, "POF,"[8] and Fetlife, and "haven't met anyone since May 2021." Brideg2-CT stated, "Want to add MINOR to my experiences..feel what an experienced teenage cock addict does to make her lover cum in her." The following excerpt details Brideg2-CT's subsequent question of the OCE:



25.     The conversation continued, and Brideg2-CT asked the OCE, "When you let other guys fuck [MINOR], do they use condoms or do as nature intended?" The OCE advised him to bring condoms as well as the Plan B pill.  Brideg2-CT responded, "I'd be ok with that."

---

[8] Plenty of Fish is a dating application.

26.     On or about September 12, 2023, the OCE sent Brideg2-CT a photo of MINOR.[9] During their conversation, the OCE advised Brideg2-CT that MINOR was 12 years old in the photo. He told the OCE that she was pretty. He then asked if she was on birth control. The OCE explained that she was not on birth control. The conversation continued with Brideg2-CT asking the OCE various questions pertaining to MINOR's sexual behaviors. Brideg2-CT then stated, "Maybe, I'll get to see her someday."

27.     On or about September 17, 2023, Brideg2-CT requested another photo of MINOR. He stated, "I still want to see a picture of her now. You said her tits are wonderful now. hehe. See how she blossomed from a 12 year old pic till now." On or about September 18, 2023, the OCE then sent Brideg2-CT another photo of MINOR, as he requested. Brideg2-CT replied, "That's not her, that's her mom." As the conversation continued, Brideg2-CT stated, "I'll let you choose when, but, I think MINOR should meet me in some fashion before end of month."

28.     On September 19, 2023, the OCE and Brideg2-CT exchanged greetings. Brideg2-CT asked the OCE if he and MINOR had fun last night. The OCE related that the previous evening was uneventful. The OCE then stated, "I told her I wanna save it until Friday night...end of the week release." Brideg2-CT replied, "Might be two for her if things work out." Brideg2-CT then stated, "Friday, I'm mostly sure we could meet. I'm just on call this week and they might turn on a new tool this weekend which would ring my cell. If they decide not to turn it on til Monday, I'll know for sure ...test is Friday morning."

29.     Brideg2-CT then explained that he was "kinda on edge" due to the fact that he had been "catfished " in the past and worried that the meeting may be a "sting operation." The OCE

_____

[9] All images sent by the OCE to Brideg2-CT of MINOR were not images of an actual child but give the appearance of a minor female. These images were not explicit.

replied, "I totally understand and I would feel the exact same way. Like I said, this is not for everyone." Brideg2-CT replied, "Gotta convince myself. I know that technically, if this was a police trap, I've already given enough info for them to roll up days ago." The OCE then stated, "Like I said, it's not for everyone. Just let me know."

30. Brideg2-CT then provided the OCE with a "fantasy situation," and stated "Say I do meet with you two..keep meeting you two until she graduates high school, and marry her. Would you still want to fuck her at that age?" The OCE responded, " Ha…of course!!!!!!" Brideg2-CT continued, "And...if I marry her and have kids with her..what age would you like to duck them with me...quack quack and fuck them too." The OCE then related to him "Ha...let's just make sure you are comfortable with this arraignment first ...then we can chat about that at a later time."

31. On September 20, 2023, as the conversation continued, Brideg2-CT advised that the southbound traffic during the week is heavy. He then sent the OCE a screen shot from his Waze navigation application that depicted it would take him approximately one hour to travel "Home, to Ikea." It is my understanding that the only IKEA furniture store in Connecticut is located in New Haven. Utilizing DMV records, investigators were able to verify that DICKSON resided in Colchester, Connecticut, and ascertained that the drive between DICKSON's residence and IKEA in New Haven would take approximately one hour.

32. On September 21, 2023, Brideg2-CT explained that he would rather initially meet the OCE and MINOR in a public place and then go back to the OCE's home. He suggested meeting at IKEA in New Haven and eating dinner there. The OCE advised him that he was not going to eat dinner at IKEA. Brideg2-CT then related, "Well if you invite me back to your place to hangout, then we can talk about whatever comes up next...I might watch for a few mins and join soon after. This is all the first time only. Anything after, if you invite me back, won't have this screening

meeting." The OCE then replied, "Ok...i don't play games and waste time. I have met folks in your position. It sounds like you are not totally on board, which is fine. I know this is not for everybody. I want you to tell me if and when you are ready so the experience is the best you have had." Brideg2-CT replied, "I'm on board. I'm just terrified of an underage sex sting. That's why I am trying to choose that first environment neither of us controls. The only reason. If you were in my position and had catfishes trying to catch you, you'd probably feel the same way. Not playing games either."

33.     The OCE advised Brideg2-CT that he understood where he was coming from. The OCE asked DICKSON after they met in public, what he had in mind for the rest of the encounter. Brideg2-CT stated, "Meet in public. You look around, I look around. No guys in gray suits holding hand to ear or white panel vans parked super close. You invite me over to your place. [MINOR] unzips your pants, starts sucking your cock..then I unbutton my pants and pull down my zipper, showing I'm ready." The OCE told Brideg2-CT that they would not be going to his apartment for the encounter. The OCE stated, "I think there is a hotel by IKEA, right? Unless it closed." Brideg2-CT related he was not familiar with any of the hotels in the New Haven area. The OCE replied to Brideg2-CT and told him that he was getting out of work and would chat with him later.

34.     On or about September 21, 2023, at approximately 4:42pm., Brideg2-CT sent the OCE a message that read, "I'm looking around at hotels." As the conversation continued, Brideg2-CT asked the OCE, "I didn't scare you away did I?" The OCE explained that he was a bit scared due to Brideg2-CT continuously talking about his fear of a sex sting.  Brideg2-CT stated that he was "too paranoid sometimes." He stated in part, "I'm already on alert after that catfish found my mom's and stepbrother's info and tried to extort me." The OCE then replied, "Yeah. lets not do this now..doesn't seem comfortable for you.." Brideg2-CT then stated, "I've got an easy way to get

past all this. You said she is 16, right? If you said she's 16, and I know she's 16, and she's consenting, then legally there's nothing wrong. So just say she is 16 and we're past all my worrying. So how old is MINOR?" The OCE replied, " Ummmmm...14..i mean 17, 16." Brideg2-CT responded, "16? OK, I'm good to meet tomorrow. I'm good to fuck her is she wants to have it. And no public meet ups since she's that age." The OCE replied, "Cool. Pick a spot ...condoms and Plan B." The OCE and Brideg2-CT agreed on the Fairfield by Marriott located in Wallingford, CT.

35.     During the evening of September 21, 2023, DICKSON notified the OCE that he had booked a room at the Fairfield by Marriott located at 100 Miles Drive in Wallingford. The OCE told DICKSON to bring condoms and a Plan B One-Step emergency contraception pack for their encounter.

36.     In the morning of September 22, 2023, Brideg2-CT asked, "Does MINOR know anything about tonight?" The OCE informed him that MINOR was aware of the meeting. Brideg2-CT then suggested he and the OCE search for another female for MINOR. He related that he was talking to a girl on Kik but was unsure if she was real. Brideg2-CT provided the OCE the display name of the female he was referring to.[10]

37.     Later that afternoon, members of the Wallingford PD, FBI Child Exploitation Task Force, and the FBI Violent Crimes Task Force began preparing for a possible meet between the OCE and DICKSON. Investigators including your affiant went to the Fairfield by Marriott and spoke to the general manager. They provided the manager with an administrative subpoena and they were able to confirm that DICKSON had in fact booked and paid for a room at the hotel for September 22 through September 23, 2023.

---

[10] The OCE immediately recognized the display name as that of another undercover law enforcement officer.

38.     The OCE continued to communicate with Brideg2-CT. At approximately 3:30 P.M. Brideg2-CT advised the OCE he was going to be getting out of work soon. He said he was going to get something to eat, purchase the Plan B, condoms and go to the hotel. At approximately 5:34 PM Brideg2-CT sent the OCE a photo of condoms and Plan B:



A male fitting DICKSON's description is visible in the reflection of the photo. Brideg2-CT and the OCE continued to communicate concerning their estimated arrival times.

### DICKSON Arrives at the Hotel

39.     On September 22, 2023, at approximately 6:45 P.M., investigators arrived in the area of the Fairfield by Marriott. I was also present at that time. An officer observed DICKSON operating his 2015 black Hyundai Sonata in the hotel parking lot; DICKSON appeared to be circling the hotel in the parking lot before he eventually parked. An officer engaged his lights and sirens and pulled in behind DICKSON's vehicle. DICKSON was approached, identified, and taken into custody by the Wallingford PD.

40.     At approximately the same time, investigators observed a Google Pixel style cell phone in the center cup holder of the vehicle. The screen was unlocked and illuminated. The phone was open to the Kik chat with the OCE, and the phone was seized by investigators.

41.     DICKSON was charged for charged with (1) Criminal Attempt at Illegal Sexual Contact Of a Victim Under The Age Of 16 Years Old; (2) Criminal Attempt at Sexual Assault 2nd, (3) and Criminal Attempt at Enticing a Minor.

**Interview of DICKSON**

42.     On September 22nd, 2023, at approximately 7:52 P.M., DICKSON was interviewed at the Wallingford PD by a Wallingford police officer, and FBI Special Agent. I was also present and participated in the interview. In advance of the interview, at approximately 7:47 P.M., DICKSON was advised of his *Miranda* rights. DICKSON provided with a Wallingford PD Advisement of Rights form. DICKSON the form to himself, initialed the form, and signed the waiver of rights at approximately 7:51 PM, and the interview became immediately thereafter.

43.     Over the course of the interview, DICKSON provided the following information: DICKSON initially denied knowing that the female he intended to meet was fourteen years old. DICKSON eventually admitted that he knew he was there to meet a fourteen-year-old girl and to have intercourse with her. DICKSON denied being interested in prepubescent girls.

44.     During the investigation, investigators have learned that DICKSON is college educated and works in the of area of cybersecurity for a large company. During the interview, DICKSON expounded on his technological expertise. During the interview DICKSON stated that he had downloaded the Tor browser on his cell phone and computer the day prior. Based on my training and experience I know that some individuals use Tor to access child pornography.

45.     During the interview DICKSON also admitted that he has observed child pornography online. He stated he had not done so in a "long time." At one point during the interview, DICKSON stated that he last accessed child pornography from a file sharing website in approximately 2009. DICKSON stated that if investigators were to check all of his electronics they would find fake nude photographs of minors. He explained that he had an application that he used to edit photos of minors with clothes on and make them appear nude.

## Retrieval of the TARGET DEVICES

46.     After the interview had concluded, at approximately 10:00PM, DICKSON provided verbal consent and read and signed an FBI Consent to Search form, which stated that he gave FBI permission to search "hard drives, computers, phones, digital storage devices" located at his residence in Colchester. DICKSON. The form stated "I have been advised of my right to refuse consent. 3. I give this permission voluntarily. 4. I authorize these agents to take any items which they determine may be related to their investigation." DICKSON provided investigators with detailed instructions as to how to enter his residence and locate the electronic devices. Specifically, DICKSON related that the he had a desktop computer in his living room. He also advised that there was a server in his basement with a laptop computer. He also related that he has three cats and to be aware of them and ensure they do not go outside.

47.     The investigators then drove to DICKSON's residence. Upon entering the residence, the investigators observed the house to be very cluttered. They proceeded to the living room and observed a black desktop computer. This device was unplugged from the power source and secured.  The investigators then walked through the main floor of the residence and found another laptop located in a second living room. It too was secured by the investigators.  The investigators then ascended the stairs to the second floor. Nothing of evidentiary value was

observed. The investigators then went to the basement of the residence. Upon descending the stairs, the investigators observed the server that DICKSON had described as well as the laptop. Both were then unplugged from their respected power sources. While at DICKSON's residence, investigators retrieved all of the TARGET DEVICES, with the exception of the TARGET PHONE, which had been previously seized from DICKSON's car. Investigators recorded the names and serial numbers of each device removed from DICKSON'S residence and a receipt with the name and serial numbers of said devices was left on the kitchen table. Shortly thereafter, the investigators exited the residence with the above-mentioned devices. The TARGET DEVICES were then brought to the FBI field office in New Haven and secured.

## **TECHNICAL TERMS**

48.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by

connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).

Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

49. Based on my training, experience, and research, I know that the TARGET PHONE has capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

50. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

51. There is probable cause to believe that things that were once stored on the TARGET DEVICES may still be stored there, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather,

23

that data remains on the storage medium until it is overwritten by new data.

b.     Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.     Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

52.     *Forensic evidence.*  As further described in Attachment B, this application seeks

permission to locate not only electronically stored information that might serve as direct

evidence of the crimes described on the warrant, but also forensic evidence that establishes how

the Device was used, the purpose of its use, who used it, and when.  There is probable cause to

believe that this forensic electronic evidence might be on the Device because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.     Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how

electronic devices were used, the purpose of their use, who used them, and when.

      d.     The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

     53.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the TARGET DEVICES consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the TARGET DEVICES to human inspection in order to determine whether it is evidence described by the warrant.

     54.    *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

     55.    Based on the aforementioned factual information, I believe there is probable cause to believe, and I do believe, that evidence of the TARGET OFFENSES is located within the TARGET DEVICES, as more fully described in Attachment A, which constitutes and contains items that constitute contraband, fruits, instrumentalities and evidence of

crime, or material otherwise criminally possessed, or property that is or has been used as the means of committing the TARGET OFFENSES.

56.     I respectfully request that this Court issue a warrant authorizing the search of the TARGET DEVICES, as more fully described in Attachment A, for the items more specifically identified in Attachment B.

Respectfully submitted,

Michael Rooney
Digitally signed by
Michael Rooney
Date: 2023.09.29
12:50:34 -04'00'

MICHAEL ROONEY
Task Force Officer
Federal Bureau of Investigation

Subscribed and sworn before me by telephone this 29th day of September, 2023, in New Haven, Connecticut.

Robert M. Spector
Digitally signed by Robert
M. Spector
Date: 2023.09.29
15:45:01 -04'00'

HON. ROBERT M. SPECTOR
UNITED STATES MAGISTRATE JUDGE